William INGE and The W-S Bus Stop Company, a Limited Partnership, Plaintiffs,

v.

TWENTIETH CENTURY-FOX FILM CORPORATION, Defendant.

United States District Court
S. D. New York.
July 30, 1956.

**296**

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiffs. Jay H. Topkis, New York City, Stephen Wise Tulin, New York City, of counsel.

Dwight, Royall, Harris, Koegel & Caskey, New York City, for defendant. John F. Caskey, Harry J. McIntyre, Herbert C. Earnshaw, New York City, of counsel.

LEVET, District Judge.

This is a motion by plaintiffs for a preliminary injunction to restrain the defendant during the pendency of this action and until December 1, 1956, from exhibiting in the United States or Canada any motion picture version of the work entitled "Bus Stop," and for other collateral relief. The action was begun in the Supreme Court, New York County, and later removed to this Court.

The plaintiff William Inge was the author and The W–S Bus Stop Company, a Limited Partnership, hereinafter referred to as plaintiff company, was the Broadway producer of the play "Bus Stop." The defendant is a Delaware corporation engaged in the production of moving pictures.

Prior to May 19, 1954, plaintiff Inge wrote the original dramatic work entitled "Bus Stop." The plaintiff company is the assignee of Whitehead-Stevens Productions, Inc. under a contract with the plaintiff Inge, dated November 15, 1954, and has the sole and exclusive right to produce and present the play on the stage of the United States and Canada, subject, however, to the contract between plaintiff Inge and the defendant, hereinafter mentioned.

On March 23, 1955, an agreement was made between plaintiff Inge and the defendant, whereby Inge granted to the defendant certain motion picture and other rights in the play. The plaintiff company consented to the agreement. The provision which is involved here is Paragraph Fifteenth of this contract, which is as follows:

"(a) With respect to release of the first motion picture version of the Play, Purchaser agrees as follows: '

"1. With respect to United States and Canada, Purchaser agrees not to release said motion picture anywhere therein until all first-class stage presentations of the Play therein have closed (as herein defined), or June 1, 1956, whichever is earlier. All first-class stage presentations of the Play in United States and Canada shall be deemed to have 'closed' if (i) the first-class stage presentation of the Play on Broadway, New York shall have closed and (ii) after September 15, 1955 there shall have elapsed a period of thirty (30) days during which period no first-class road company of the Play shall have been presented in the United States or Canada and during which period there have not been executed a contract for a first-class road booking of the Play in the United States or Canada thereafter and contracts with the two leads in the Play to appear therein. Seller agrees that, after the close of the first-class presentation of the Play on Broadway, New York, Seller will in good faith notify Purchaser of plans concerning a road tour of the Play in the United States or Canada.

"2. With respect to England, Scotland and Wales (herein called England) if prior to January 1, 1956 a contract has been executed for a first-class presentation of the Play in England and pursuant to said contract said presentation is scheduled to open on or before March 1, 1956, then and in that event Purchaser agrees not to release said motion picture in England until the said first-class presentation of the Play shall have closed or June 1, 1956, whichever is earlier.

"3. With respect to Australia and New Zealand, if prior to January 1, 1956 a contract has been executed for a first-class presentation of the Play in Australia or New Zealand and pursuant to said contract said presentation is scheduled to open on

or before March 1, 1956, then and in that event Purchaser agrees not to release said motion picture in Australia or New Zealand until the said first-class presentation of the Play shall have closed or June 1, 1956, whichever is earlier.

"(b) With respect to United States and Canada, England and Australia, Purchaser agrees that until four (4) weeks prior to the earliest date on which the first motion picture produced hereunder may be released in each of said countries, Purchaser will not cause any theatre in such territory under the control of Purchaser, to advertise the date of the opening in said theatre of the said motion picture. Nothing herein contained shall prevent Purchaser at any time from advertising or publicizing the said motion picture in such manner as Purchaser may determine."

By a letter agreement or modification bearing the same date, the date "June 1, 1956" was changed to "December 1, 1956."

The play had a successful run of well over a year on Broadway, closing on April 21, 1956. A road company was able to earn profits for the producer of $86,139.-13. The then current road company closed in New Haven, Connecticut, on May 5, 1956. Under the terms of the agreement between the parties, the defendant was to become entitled to release its film "Bus Stop," unless within thirty days, or by June 4, 1956, contracts were signed for a further first-class road company.

On May 8, 1956, Audrey Wood as attorney-in-fact for plaintiff Inge, wrote Joseph Moskowitz, vice president of the defendant, to the effect that the last road company of the play closed on May 5, 1956, in New Haven, and notified the defendant that the plaintiffs intended to take the play on tour in the Fall of the year, enclosing a projected road company tour schedule commencing on August 13 at Chicago and running through the months of October and November 1956 and continuing through December 1956 and January and February 1957.

At some time before May 19, 1956, apparently the defendant determined to release the picture "Bus Stop" in August 1956. Notice of this intention appears in an inconspicuous line of a copy of the Motion Picture Herald of May 19, 1956. The same announcement was contained in the same publication of May 26, 1956. Whatever defendant's reasons were for this proposed action, it appears that its vice president in his affidavit said: "This company has no picture of the quality and box office appeal of 'Bus Stop' to substitute for it." Defendant may have been confronted with the problem arising from its error in schedule production.

Plaintiffs contend that they were unaware of the defendant's decision to release prematurely the film and, therefore, went ahead with their plans for a further road company.

On May 28, 1956, plaintiff company and one Jules Pfeiffer entered into a sublicensing agreement, whereby Pfeiffer secured first-class stage rights in "Bus Stop" for a first-class company on tour. Plaintiff Inge concurred in this agreement in a rider accompanying the same. This contract with Pfeiffer obligated him to present the play in a first-class theatre, with a first-class cast, and with a first-class director. Pfeiffer is reputed to be an experienced producer. On May 31, 1956, it appears that Pfeiffer entered into a contract for a theatre in Chicago. Miss Helen Gallagher, star of "Hazel Flagg" and "Pajama Game" and featured in other plays, and Rip Torn, who is reputedly playing the lead on Broadway in "Cat On A Hot Tin Roof," were engaged to play the two leads.

The defendant opposes this application upon the following grounds:

(1) The restrictions on the release date of the motion picture "Bus Stop" are illegal, immoral and unenforceable;

(2) That the conditions of Paragraph Fifteenth have not been met; and

(3) That there is no basis for equitable relief presented by plaintiffs' application for a preliminary injunction.

■ It is elementary that under the terms of the present copyright statute, 17 U.S.C.A. § 1 et seq., the unauthorized public performance of a dramatic work by means of a moving picture is unquestionably an infringement. Metro-Goldwyn-Mayer Distributing Corporation v. Bijou Theatre Co., 1 Cir., 1932, 59 F.2d 70; Stodart v. Mutual Film Corp., D.C. S.D.N.Y.1917, 249 F. 507, affirmed 2 Cir., 1949, 249 F. 513; Stonesifer v. Twentieth Century-Fox Film Corp., D.C. S.D.Cal.1942, 48 F.Supp. 196, affirmed 9 Cir., 1944, 140 F.2d 579.

■ The plaintiff Inge, of course, had a right to license his copyright for moving picture and other purposes. In Fox Film Corp. v. Doyal, 286 U.S. 123, 127, 52 S.Ct. 546, 547, 76 L.Ed. 1010, Chief Justice Hughes said:

"* * * The owner of the copyright, if he pleases, may refrain from vending or licensing and content himself with simply exercising the right to exclude others from using his property. Compare Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 422, 424, 28 S.Ct. 748, 52 L.Ed. 1122."

■ Any limitations or conditions which the parties see fit to insert will be binding and may be enforced except where they are contrary to public policy or in violation of law. Buck v. Hillsgrove Country Club, Inc., D.C.R.I., 1937, 17 F.Supp. 643; Manners v. Morosco, 252 U.S. 317, 40 S.Ct. 335, 64 L.Ed. 590; Underhill v. Schenck, 238 N.Y. 7, 143 N. E. 773, 33 A.L.R. 303.

There appears to be nothing in the agreement nor its background which sustains the defendant's contention in reference to the alleged invalidity of the restrictions in reference to the release date. The defendant asserts that the Dramatist Guild, to which plaintiff Inge belonged, required:

(1) That the so-called "pre-production deal," that is, a sale of the motion picture rights in a play which has not yet opened on the stage, be completed before the opening of the play on the stage; and

(2) That the Dramatist Guild made it mandatory in transactions for purchasing the rights to make motion pictures from proposed or active Broadway stage plays, that there be a restriction on the time before which the motion picture may be released.

■ The fact that this feature may have influenced plaintiff Inge in refusing to execute a contract without such a restrictive date is not necessarily indicative of any improper restriction in the agreement itself nor any indication of so-called restraint of trade or other invalidity. The fact is that the copyright belonged to Inge, that he is a party who made the contract, that there was no necessity for the purchase of this particular film by the defendant since it appears that as a matter of fact film companies draw only a portion of their stories from the members of the Guild. According to the affidavit of Edward E. Colton, the negotiator appointed by the Dramatist Guild, in 1953, 1954 and 1955, fewer than sixteen plays per year were sold in negotiations in which the Guild participated, whereas according to the affidavit of Rae Fixel, in 1955, American film companies made a total of 392 films. Since there are so many other sources of supply in existence and the relevant market is so broad, it does not appear that there is an illegal monopoly under Section 2 of the Sherman Act, 15 U.S.C.A. § 2. See United States v. E. I. du Pont de Nemours and Company, 76 S.Ct. 994.

The antitrust defense of defendant, Twentieth Century-Fox Film Corporation, does not appear to be sustained by facts, and this defense, I believe, does not constitute a bar to injunctive relief. See Alfred Bell & Co. v. Catalda Fine Arts, 2 Cir., 1951, 191 F.2d 99; Mytinger & Casselberry, Inc., v. Numanna Laboratories Corp., 7 Cir., 1954, 215 F.2d 382. In the Bell case, supra, Judge Frank expressed the principles involved as follows:

" \* \* \* We have here a conflict of policies: (a) that of preventing piracy of coprighted [sic] matter and (b) that of enforcing the anti-trust laws. We must balance the two, taking into account the comparative innocence or guilt of the parties, the moral character of their respective acts, the extent of the harm to the public interest, the penalty inflicted on the plaintiff if we deny it relief. As the defendants' piracy is unmistakably clear, while the plaintiffs' infraction of the anti-trust laws is doubtful and at most marginal, we think the enforcement of the first policy should outweigh enforcement of the second." 191 F. 2d at page 106.

In contending that the conditions of Paragraph Fifteenth of the contract have not been met by the plaintiff, the defendant alleges, among other things, as follows:

(1) That the language of the agreement has no application to successive road companies;

(2) That the language relates to so-called W–S Productions;

(3) That the contemplated tour by Pfeiffer is not that of a first-class company;

(4) That the contracts with the two actors for the two leading roles were not entered into within thirty days from May 5, 1956, and that the sub-license to Pfeiffer by its terms has expired.

[5] An examination of the contract and the facts alleged by the plaintiff, which are not substantially controverted by the defendant, shows due compliance with the contract sufficient to preclude the release of the film. The net effect of the contract, Paragraph Fifteenth, was that the defendant was forbidden to release its film in the United States and Canada until December 1, 1956, (i) if any first-class road company were appearing or (ii) if within thirty days following the closing of any current first-class company contracts were signed for a new first-class company.

In this connection the plaintiff notified the defendant by letter of a projected stage company, the plaintiff signed the contract for a first-class company, the defendant asked for and received copies of these contracts, and the plaintiff sought to induce the defendant to withdraw its threatened release of the film set for August 1956.

■ Equity will not open its doors to one who seeks its aid for the purpose of violating a contract. 30 C.J.S., Equity, § 99, p. 497. The Court will not be zealous to seek a defense to this action upon behalf of the defendant to enable it to avoid what appears to be a plain obligation of a contractual character.

I believe that the plaintiffs have shown, for the purpose of this motion, that they have duly complied with the conditions necessary to require the defendant to defer release of the picture.

The defendant asserts that there is no basis for equitable relief by way of a preliminary injunction. The gist of defendant's contentions appear to be:

(1) That plaintiffs' losses will be small or that in fact the release of the film before December 1, 1956 will promote, rather than diminish, stage profits;

(2) That a preliminary injunction would alter the status quo rather than retain it;

(3) That the "balance of convenience" between plaintiff and defendant favors the defendant;

(4) That no irreparable injury will result to plaintiff.

■ It may be noted at the outset that in cases of infringement of copyright, an injunction has always been recognized as a proper remedy because of the inadequacy of the legal remedy; that the remedy exists both by statute and independently thereof. American Code Co. v. Bensinger, 2 Cir., 1922, 282 F. 829.

Title 17 U.S.C.A. § 112 is as follows:

"§ 112. Injunctions; service and enforcement

"Any court mentioned in section 1338 of Title 28 or judge thereof

shall have power, upon complaint filed by any party aggrieved, to grant injunctions to prevent and restrain the violation of any right secured by this title, according to the course and principles of courts of equity, on such terms as said court or judge may deem reasonable. Any injunction that may be granted restraining and enjoining the doing of anything forbidden by this title may be served on the parties against whom such injunction may be granted anywhere in the United States, and shall be operative throughout the United States and be enforceable by proceedings in contempt or otherwise by any other court or judge possessing jurisdiction of the defendants. July 30, 1947, c. 391, § 1, 61 Stat. 652; Oct. 31, 1951, c. 655, § 16(c), 65 Stat. 716."

As stated in the Bensinger case, supra: "Wherever equity has jurisdiction to grant an injunction by final decree, it has jurisdiction to grant a preliminary injunction." At page 835. Moreover, quoting from Judge Rogers in the case just mentioned: " * * * to make out a case warranting a preliminary injunction the complainant need not make out such a case as will entitle him to a decree on final hearing." At page 835. And: "In the more recent copyright cases, however, there appears a disposition to grant the injunction somewhat more freely than formerly." At page 835. Judge Rogers further stated:

"We think the rule is correctly laid down in Drone on Copyright, p. 516, where it is said:

" 'Although the matter may not be wholly free from doubt, yet if the plaintiff makes out a prima facie case, and the court is reasonably satisfied that a piracy has been committed, a temporary injunction will usually be granted, especially if the consequences are likely to be more serious to the plaintiff if the injunction is withheld than they will be to the defendant if it is granted.'

"Where the plaintiff has made a prima facie case in regard to the existence of the copyright and its infringement, a temporary injunction will, as a general rule, be issued. George T. Bisel Co. v. Bender, C.C., 190 Fed. 205; Da Prato Statuary Co. v. Giuliani Statuary Co., C.C., 189 Fed. 90." At page 835.

In Hamilton Watch Co. v. Benrus Watch Co., 2 Cir., 1953, 206 F.2d 738, an action under the Clayton Act, Judge Frank said:

" * * * To justify a temporary injunction it is not necessary that the plaintiff's right to a final decision, after a trial, be absolutely certain, wholly without doubt; if the other elements are present (i. e., the balance of hardships tips decidedly toward plaintiff), it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." At page 740.

It is also not amiss to observe that the Second Circuit as long ago as 1914, in the words of Judge Ward, wrote:

" * * * Preliminary injunctions are granted more readily in dramatic than in other cases because the delay involved in waiting for a final decree would generally amount to a denial of justice." Chappell & Co. v. Fields, 1914, 210 F. 864, 866.

The present defendant was enjoined pendente lite after appeal to the Second Circuit in a somewhat similar action in L. C. Page & Co. v. Fox Film Corporation (now Twentieth Century-Fox Film Corporation), 1936, 83 F.2d 196. Here, as there, the defendant apparently was in effect a wilful infringer. (In the case at bar, at least to the extent of the threatened prematurity of release.) There, likewise, Twentieth Century-Fox raised the defense of substantial investment and its own solvency. Judge Swan, however, stated:

"* * * The defendants acted with their eyes open; they were expressly warned before they began production of the picture that the plaintiff would seek equitable as well as legal relief; and there was no laches in starting the suit. * * * They urge that an injunction should be denied because they are solvent, recovery on the accounting will amply compensate the plaintiff, and their own losses, if enjoined from releasing the picture for exhibition, will be great. We recognize, of course, that, where damages will adequately compensate a complainant and where granting an injunction might work injury to the defendant out of proportion to that resulting to the complainant from its refusal, a preliminary injunction may be denied. New York Grape Sugar Co. v. American Grape Sugar Co., C.C.N.D.N.Y., 10 F. 835; Overweight Counterbalance Elevator Co. v. Cahill & Hall Elevator Co., C.C.N.D.Cal., 86 F. 338; Gillette Safety Razor Co. v. Durham Duplex Razor Co., D.C.N.J., 197 F. 574. But we do not see that the principle is applicable. An accounting—usually a protracted proceeding at the best—will be particularly complex here because the infringement relates only to 'talking' motion picture rights. The apportionment of profits between 'talking' and 'silent' rights is sure to raise difficult and controverted questions. Under such circumstances we do not think the remedy of an accounting is an adequate substitute for an injunction. Any inconvenience or loss which an injunction may cause the defendants should not appeal strongly to the chancellor's conscience, for it made its investment with full knowledge of the plaintiff's rights. *A willful infringer should not by the extent of his investment be allowed to gain immunity from the injunctive remedy.*" (Emphasis supplied.) At page 83 F.2d 200. See also Houghton Mifflin Co. v. Noram Pub. Co., D.C.S.D.N.Y.1939, 28 F. Supp. 676.

Under the circumstances, if a preliminary injunction is not granted the computation or determination of plaintiffs' damages would be a difficult and complex task, although the damages may be real and in all likelihood substantial. There is no easy way of measuring a comparison of return to the stage production under a condition without film competition and that with film competition. The plaintiff is entitled to that for which he bargained, and it appears that he will sustain an irreparable loss if he is subjected to uncertainty of film rivalry, especially in the short period remaining before December 1, 1956.

Any extra expense to which the defendant may have committed itself in seeking to release the film before December 1, 1956, was wilfully incurred with wide-open eyes and in face of the notice given to it by plaintiffs. There is no substantial proof here upon this motion that the defendant has subjected itself to irretrievable expenses in addition to those it normally would have had in order to market this film for the December 1, 1956 (or earlier) release. There is no proof that defendant will lose anything by deferral. It may, in fact, be argued that the prolongation of the stage production will increase the public desire to attend the moving picture production. The fact that the defendant may gain by an earlier release than anticipated, that the defendant now seeks an outstanding film for its market, or that the leading actress in the film "Bus Stop" has recently secured certain publicity is not germane to the more tangible issues of this motion.

The prospective losses to the plaintiffs from the threatened violation of the agreement are as follows:

First, plaintiffs' revenues from their contract with Mr. Pfeiffer would be prejudiced. Under that contract, plaintiffs are entitled to three types of payment. Plaintiff Inge is entitled to 10% of the gross weekly box office receipts; plaintiff

company is to receive 3% of the same receipts, or $300 per week, whichever is greater, plus 5% of the net profits of the production. The gross receipts and the profits would both be affected by competition from the motion picture. Present calculation of the extent of this harm is impractical; measurement afterwards would be impossible.

Second, plaintiffs are entitled under their agreement with defendant to continuing weekly payments for the motion picture rights, if a first-class road company is touring profitably. These payments are set at 10% of the gross weekly receipts of any touring companies, up to a maximum of $1,250 per company per week, and provided further that plaintiffs shall not receive, in total payment for the motion picture rights, more than $250,000. Under the agreement between plaintiffs and defendant, $226,807.16 has now been paid or is payable, leaving an additional $23,192.84 which may still be earned by plaintiffs as a result of profitable weeks of first-class road companies. If defendant's picture were allowed to compete with Mr. Pfeiffer's road company, such company would not be likely to earn profits. Although plaintiffs concede that defendant could damage them in this field by no more than $23,192.84, there is no method of measuring how close to that sum the damage actually would be.

Third, defendant's wrongful competition would adversely affect plaintiffs by hurting the "stock" companies which plaintiffs have licensed. Mr. Moskowitz states that "Bus Stop" is being done in "stock" in at least thirty-three summer theatres this summer, pursuant, of course, to licenses from plaintiffs. These "stock" companies would surely be hurt by competition from defendant's film (and so the royalties received by plaintiffs would be reduced), but measuring the loss would be impossible.

If defendant's picture is released in advance of the contractual date, this harm cannot be measured, now or later, but it will certainly be substantial.

All persons having an interest in the subject of the action in obtaining the relief demanded may join as plaintiffs. Joint proprietors of copyright may sue jointly for its infringement. The parties plaintiffs are sufficient and proper. 18 C.J.S., Copyright and Literary Property, § 149, p. 257. There are no laches on the part of this plaintiff.

The plaintiff Inge and plaintiff company combined hold all rights not vested in the defendant. Moreover, any obligation of the defendant to the plaintiff Inge also inures to the plaintiff company insofar as it may be affected. See Lawrence v. Fox, 20 N.Y. 268; McClare v. Massachusetts Bonding & Insurance Co., 266 N.Y. 371, 379, 195 N.E. 15; Ultramares Corp. v. Touche, 255 N.Y. 170, 180, 174 N.E. 441, 74 A.L.R. 1139.

Consequently, I conclude that the plaintiffs are entitled to an injunction enjoining and restraining the defendant, its agents, servants and employees and all persons acting in concert with them, during the pendency of this action and until December 1, 1956, from in any way causing or permitting to be publicly exhibited in the United States or Canada any motion picture version of the work entitled "Bus Stop" and from causing or permitting any theatre in the United States or Canada to advertise the date of opening in the said theatre of any motion picture version entitled "Bus Stop" until four weeks prior to December 1, 1956.

The preliminary injunction, however, is made without prejudice to the right of the defendant to vacate such preliminary injunction in the event that plaintiffs, in the subsequent opinion of this Court, shall have no longer complied or shall have ceased to comply with the essential prerequisites to defer the issuance or release of the film "Bus Stop" as stated in the agreement.

The granting of the preliminary injunction herein is also conditioned upon the plaintiffs supplying a good and sufficient bond approved by this Court in the sum of $50,000 to indemnify the defend-

ant against any loss in the event said defendant shall ultimately succeed in the final disposition of this matter.

The defendant, by counter-motion, moved this Court for an order vacating the temporary restraining order issued on July 17, 1956 by the Hon. Henry Epstein, Justice of the Supreme Court, New York County. This stay was deemed by the parties to be transferred to the jurisdiction of this Court at the time of removal from the State Court. Since the plaintiffs will be protected by the preliminary injunction to be made herein, this motion will be granted, to take effect however only upon the signing, entry and service upon the defendant of a copy of the order hereon.

The above constitutes the findings of fact and conclusions of law upon which this preliminary injunction is granted.

Settle order on notice.