**MARVIN WORTH PRODUCTIONS,** Douglas International Corporation and Sally Marr, individually and as Administratrix of the Estate of Lenny Bruce, Plaintiffs,

v.

**SUPERIOR FILMS CORPORATION,** Herbert S. Altman and Budco Distributing Corp., Defendants.

No. 70 Civ. 3558.

United States District Court,
S. D. New York.

Sept. 30, 1970.

**1270**

Schwartz & Frohlich, New York City, for plaintiffs; Michael S. Fawer, John L. Amabile, Jeffrey A. Moross, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for defendants; Marshall C. Berger, New York City, of counsel.

LASKER, District Judge.

Plaintiffs, suing under 17 U.S.C. § 1 et seq., move for a preliminary injunction restraining the defendants from producing, publicizing or distributing a film containing material which allegedly infringes their copyrights. The copyrights apply to two books by and about the late night club entertainer and social critic Lenny Bruce ("Bruce"). The first, "How to Talk Dirty and Influence People," describes itself as an autobiography of Bruce; the second, "The Essential Lenny Bruce," is a collection of his commentaries, jokes, monologues and routines. The copyright on the first is owned by Sally Marr, Bruce's mother and the administratrix of his estate. The copyright on the second is owned by Douglas Inter-National Corporation. Both are published in paperback and more than 200,000 copies of each have been sold.

Plaintiff Marvin Worth Productions ("Worth") has secured by assignment the exclusive right to use the copyrighted material of the two books to make a film on the life of Bruce, which is now in production by Columbia Pictures Corporation. Defendant Altman was also associated with Bruce during the performer's life. After Bruce's death Altman prepared a film script of Bruce's life which he offered to Marvin Worth, but which was rejected. Altman attempted also to secure permission for the use of the copyrighted material from Douglas and Marr, but they denied his request. In spite of these rebuffs, Altman has produced a biographical film about Bruce, named "Dirtymouth," and it is ready for distribution. After "Dirtymouth" was completed, Altman screened it for Worth to see whether Worth would be interested in purchasing or distributing it. Again a rejection occurred. However, as a result of his viewing the film, Worth was convinced that it contained copyrighted material which had been assigned to him, and accordingly he commenced this litigation. His complaint, and the affidavits on this motion, claim 44 specific infringements. The defendants have agreed to delete nine of the items, and I concern myself accordingly only with the remainder.

## I. The Contentions of the Parties

To the allegations of infringement the defendants answer: (1) that a substantial portion of the material is derived from public sources, jokes and factual items, and is not copyrightable; (2) that a significant number of the passages were drawn from conversations between Bruce on the one hand and Altman and Bernie Travis (who takes Bruce's part

in Altman's film) and others, and that as to such material it either was not copyrightable or, if there was a common law copyright as to it, that copyright was waived by Bruce; (3) that the doctrine of "fair use" protects the defendants; (4) that in any event, a preliminary injunction is here inappropriate in view of the severe nature of such relief and the fact that plaintiffs may secure adequate money damages should they prevail.

To these defenses plaintiffs reply: (1) that none of the material is derived from public sources or consists of jokes and factual items not copyrightable; (2) that there is insufficient evidence to establish that any of the material is drawn from conversations with Bruce and, to the extent that there may have been such origin, the material was protected by common law copyright which Bruce never waived; (3) that the doctrine of fair use does not apply in the circumstances; and (4) that a preliminary injunction should issue since a prima facie case of infringement has been made and the difficulty of determination of damages renders an injunction the sole effective relief.

■ A reading of the voluminous and well documented record and a viewing of the film "Dirtymouth" (after deletions voluntarily made by defendants) establish that defendants have copied or paraphrased Bruce's material in such substantial quantity as to constitute a prima facie case of infringement. I find that defendants have not (except as to the few jokes and factual items specified in the Appendix to this opinion) established any of the four defenses asserted, and that a preliminary injunction is required to protect the rights of the plaintiffs.

In the discussion below I deal first with the contentions that apply to some but not all of the allegedly infringing items, and thereafter with defendants' claim of "fair use," which relates to the entire body of the allegedly infringing material.

## II. Material allegedly from Public Sources or Not Copyrightable

### A. Public Source Material:

■ 1) Bruce's outspoken method of expressing his extreme views as to organized religion, sexual mores, his frank use of four-letter words, and his use of narcotics resulted in numerous criminal prosecutions against him. Defendants claim that certain allegedly infringing items in this case are derived solely from the transcripts or opinions in Bruce's prosecutions and that the use of such material is not barred by law. Without determining whether defendants in fact took the language in question from transcripts of trials or opinions, I find unpersuasive the contention that the use of such material, if originally copyrighted (as is undisputed here), is rendered innocent by inclusion in legal transcripts or opinions. To hold that such originally copyrighted material becomes somehow dedicated by use in the courts would permit the unraveling of the fabric of copyright protection. If defendants' theory were accepted, James Joyce's *Ulysses*, for example, would lie within the public domain merely because the United States prosecuted the book, unsuccessfully at that, a generation ago. Defendants cite no authority to support their position, and I find it without merit. Indeed, though not covering the point precisely, Section 8 of Title 17, U.S.C., which reads in relevant part:

> "The publication or republication by the Government, either separately or in a public document, of any material in which copyright is subsisting shall not be taken to cause any abridgment or annulment of the copyright or to authorize any use or appropriation of such copyright material without the consent of the copyright proprietor."

suggests a statutory policy opposite to defendants' theory.

■■ 2) Defendants claim that three further allegedly infringing items emanated from the uncopyrighted jackets of phonograph recordings made by Bruce.

The first two passages, defendants say, come from the jacket of "The Essential Lenny Bruce Politics." I find the attribution incorrect, however, since this "blurb" was not published until after defendants' picture was written and produced.[1] The last of these passages is said to derive from the jacket material of "Lenny Bruce, The Berkeley Concert." I have examined this jacket and do not find the material referred to— certainly not in form recognizable as a source. However, more important is the fact that the material reprinted on the jacket of "Lenny Bruce, The Berkeley Concert" consists of a commentary on Bruce's work by one Ralph J. Gleason, a critic of repute. While it may well be that Gleason had the right to utilize such material, qua critic, under the doctrine of fair use, the law does not permit a third party to lift from a critic's article copyrighted material of the original author unless the third party can independently justify his utilization under the doctrine of fair use—a matter which I deal with in a later portion of this opinion. The same observation applies to an item that defendants assert was published in The New York Times in a critic's column.

B. *Stock Jokes and Factual Material*:

■ I have indicated in the Appendix to this opinion some few jokes which I find to involve stock situations and to lack the quality of originality necessary to render them copyrightable. There are also discussed in the Appendix a few items which in my opinion are entirely factual in nature, and thus not entitled to protection. Except as thus specified, I find no other stock jokes or factual items not copyrightable.

C. *Material allegedly emanating from Conversations between Bruce and the Defendants or Others*:

■ Defendants make generalized claims that Bruce's free-wheeling con-

versational proclivities were such that much of the allegedly infringing material was to be found in his conversations with Altman, Travis and others, and that indeed he did not care whether others took and used his material. The evidence, such as it is, offered to support this assertion is found only in the affidavits of Altman and Travis. However sincerely these claims are pressed, they must be severely discounted by virtue of the fact that the affidavits are self-serving and are unrestrained by any counter-assertion by Bruce, who is dead. No affidavit of any person dissociated from the defendants is offered in support of the claim. The generality and conclusory nature of the assertions is typified by the following passage from Travis' affidavit, sworn to September 2, 1970:

"This law suit attempts to protect Lenny Bruce's material after his death. In contrast, during his lifetime Lenny Bruce never made any attempt to protect his material. When he started out as a comedian, he was part of a milieu of comedians centered around Miami Beach. Lenny Bruce took material from his co-workers and they took from him, all without complaint. This free exchange of material is alluded to in 'Dirtymouth.' Further Lenny Bruce gave away to a number of persons, including fellow comedians, tapes of his material. These were goodwill offerings and implied the free right to use them. Thus, Lenny Bruce in his lifetime has consented to precisely the types of taking which the assignees or his estate are now attempting to prevent after his death."

Such self-serving and conclusory statements are markedly insufficient to sustain the claim that the material here utilized, identical or nearly identical with the copyrighted material, was in fact derived from Bruce's conversations. No assertion is made by defendants that they recorded Bruce's conversations at

---

1. Reply Affidavit of Michael S. Fawer sworn to September 7, 1970, p. 6—uncontroverted by defendants.

or shortly after the time they occurred; that they took notes of such conversations or otherwise preserved them. Although Travis refers to tapes of Bruce's conversations, neither his nor Altman's affidavit describes what material, if any, was taken from such tapes. Indeed, the affidavits do not anywhere specify what material in "Dirtymouth" was taken from the conversations by tape or otherwise.

█ A still greater weakness in defendants' position is that even if some of their material was derived from Bruce's conversations, they have not established that Bruce dedicated this material to the public or waived his common law copyright in it. Abandonment is not to be found in negative behavior. As Judge Learned Hand stated in National Comics Publications v. Fawcett Publications, 191 F.2d 594, at 598 (2d Cir. 1951):

> "We do not doubt that the 'author or proprietor of any work made the subject of copyright' by the Copyright Law may 'abandon' his literary property in the 'work' before he has published it, or his copyright in it after he has done so; but he must 'abandon' it by some overt act which manifests his purpose to surrender his rights in the 'work,' and to allow the public to copy it."

Finding no positive evidence of intent to abandon, he went on to observe that "the very fact that [plaintiff] continuously attempted to publish 'strips' with some sort of copyright notice affixed, however imperfect that may have been, is conclusive evidence that it wished to claim a copyright upon them."

█ As in *National Comics*, so here, there is no affirmative evidence of intention to abandon common law copyright, but on the contrary, Bruce's statutory copyrighting of his own material during his lifetime is compelling evidence that he intended his original work to be protected in every respect.

## III. *The Doctrine of Fair Use*

Thus far I have dealt with the special defenses asserted which apply to a limited number of the accused items only. But the defendants' major position is anchored on the theory of fair use. This doctrine, the boundaries of which judges and commentators alike have found to be exceptionally elusive even for the law, has been well summarized as follows:

> " 'Fair use' is a 'privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner * * *' Ball, Copyright and Literary Property 260 (1944). See generally Latman, Fair Use of Copyrighted Works, Study No. 14, prepared for the Subcommittee on Patents, Trademarks and Copyrights, Senate Comm. on the Judiciary, 86th Cong., 2d Sess. (Comm. Print 1960). The fundamental justification for the privilege lies in the constitutional purpose in granting copyright protection in the first instance, to wit, 'To Promote the Progress of Science and the Useful Arts.' U.S.Const. art. 1, § 8. See Mathews Conveyor Co. v. Palmer-Bee Co., 135 F.2d 73 (6th Cir. 1943); Note, 56 Colum.L.Rev. 585, 595 (1956). To serve that purpose, 'courts in passing upon particular claims of infringement must occasionally subordinate the copyright holder's interest in a maximum financial return to the greater public interest in the development of art, science and industry.' Berlin v. E. C. Publications, Inc., 329 F.2d 541, 544 (2d Cir. 1964). Whether the privilege may justifiably be applied to particular materials turns initially on the nature of the materials, e. g., whether their distribution would serve the public interest in the free dissemination of information and whether their preparation requires some use of prior materials dealing with the same subject matter. Consequently, the privilege has been applied to works in the fields of science, law, medicine,

history and biography. See Latman, supra at 10.

"Biographies, of course, are fundamentally personal histories and it is both reasonable and customary for biographers to refer to and utilize earlier works dealing with the subject of the work and occasionally to quote directly from such works. Cf. Harris v. Miller, 50 U.S.P.Q. 306, 309 (S.D. N.Y.1941). This practice is permitted because of the public benefit in encouraging the development of historical and biographical works and their public distribution, e. g., so 'that the world may not be deprived of improvements, or the progress of the arts be retarded.' Sayre v. Moore, 1 East. 361, 102 Eng.Rep. 138, 139 (K.B. 1801); see West Publishing Co. v. Edward Thompson Co., 169 F. 833, 837 (E.D.N.Y.1909)." Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303, 306–307 (2d Cir. 1966).

The defendants here, relying primarily, if not exclusively, on the *Rosemont* opinion from which the elucidation above is drawn, claim that their use of the plaintiffs' material is a "fair use" because their taking was neither substantial in amount or quality and the appropriation, if found, is reasonably necessary to permit a production for the public benefit of a biography of Bruce.

■ The cases and commentaries attempting to define the quicksilver concept of "fair use," although varying and overlapping in their definitions, appear to agree that at least four tests are appropriate to determine whether the doctrine applies: (1) Was there a substantial taking, qualitatively or quantitatively? (2) If there was such a taking, did the taking materially reduce the demand for the original copyrighted property? (3) (As stated in *Rosemont*, supra), does the distribution of the material serve the public interest in the free dissemination of information? And (4) does the preparation of the material require the use of prior materials dealing with the same subject matter? Applying these tests to the case before me, I find that defendants have not established a fair use of Bruce's writings.

■ (1) The takings here have been substantial both in quality and quantity. Their number makes it impossible to set them forth *in extenso* in this opinion, but, except as limited in the Appendix to this opinion, an examination of the offending materials with the copyrighted texts establishes sheer copying in many instances and substantial paraphrase in others. Taken as a whole, they cannot be described as anything but substantial within the meaning of the copyright law.

(2) Since both "Dirtymouth" and plaintiffs' film deal with the same relatively narrow subject (Bruce's life) and would be exhibited to the same audiences, it seems as certain as it can be, except after the fact, that the distribution and public showing of "Dirtymouth" will operate to reduce the demand for Worth's film. As far back as Hill v. Whalen & Martell, 220 F. 359 (S.D.N.Y. 1914), it has been held that "if enough is taken * * * to materially reduce the demand for the original, the use will not be permitted." Cohen, "Fair Use in the Law of Copyright," ASCAP Copyright Law Symposium, p. 57 (1955). There can be no doubt that, in this context, the term "the original" applies not only to Bruce's already published writings, but to any film made from them. As Nimmer has stated in positing a hypothetical case remarkably analogous to the one here:

"Suppose A is the copyright owner of a published novel. B produces a motion picture copied from and substantially similar to A's novel. The motion picture may well not adversely affect the sale of A's novel. In fact it almost certainly will have the opposite effect. It is nevertheless clear that B may not invoke the defense of fair use. B's motion picture has not prejudiced the sale of A's work in the book medium, but it has certainly prejudiced the sale of A's work in the motion picture medium. If the de-

fendant's work adversely affects the value of *any* of the rights in the copyrighted work (in this case the right to convert to motion picture form) the use is not fair even if the rights thus effected have not as yet been exercised by the plaintiff." (Emphasis added.)

Nimmer on Copyright (1970), Sec. 145, pp. 646–647.

(3) Nor does the distribution of "Dirtymouth" appear necessary to serve the public interest in the dissemination of information about Bruce. There is no question here of the public being denied a film biography portraying Bruce's life; defendants are free to issue their film without the copyrighted material, and plaintiffs are preparing to release a film biographically based on the copyrighted works. The film "Dirtymouth" itself demonstrates that Bruce's life can be pictorialized for the public in useful form without improper utilization of Bruce's work. Indeed, the defendants themselves have commendably replaced nine excised and allegedly infringing sections with new material representative of Bruce's style and writings, but not drawn from his copyrighted material. The facts of Bruce's life are available to all, and plaintiffs do not, of course, contest defendants' right to their use. With material other than that taken from Bruce the defendants have demonstrated in "Dirtymouth" itself that Bruce's style, manner, philosophy and message can be portrayed without the necessity of using copyrighted work.

(4) The considerations expressed immediately above lead also to the conclusion that the preparation of the information for a film about Bruce's life does not require "some use of prior materials dealing with the same subject matter" —however definite such a requirement may be in preparing the biographies of others. No public need appears which would justify defendants' saving themselves time and trouble at the expense of plaintiffs' copyright. See Conde Nast Publications v. Vogue School of Fashion

Modelling, 105 F.Supp. 325 (S.D.N.Y. 1952).

Defendants' heavy reliance on *Rosemont, supra,* is misplaced. In *Rosemont,* the defendants sought to publish a biography of the industrialist Howard Hughes. Consistent with his well known desire for absolute privacy, Hughes' corporation Rosemont Enterprises, Inc. (which appears to have been created for the specific purpose of acquiring the rights to any copyrighted material relating to Hughes) secured the copyrights to magazine articles entitled "The Howard Hughes Story" which had appeared years before the commencement of the litigation. Immediately upon acquisition, Rosemont sought to enjoin the publication of defendants' biography of Hughes. The Court of Appeals for this Circuit, overruling the District Court, denied the application for a preliminary injunction on the principal ground that the defendants' publication constituted a "fair use."

To whatever extent these facts may be considered analogous to those here, the cases part company at this point. In *Rosemont,* the court found that defendants had copied only two direct quotations and one eight-line paraphrase. Here the quantity of taking is, of course, substantially greater. In *Rosemont,* the court held that the plaintiff appeared to be acting in bad faith and to have acquired the copyrights solely for the purpose of *suppressing* the publication of other biographical matter; here there is no dispute that the plaintiffs acquired the material in good faith and, as distinct from *Rosemont,* intend themselves to *publicize* the facts of Bruce's life. In *Rosemont,* the court found that defendants' appropriations could not have injured the plaintiff since the copyrighted articles had been out of circulation for twelve years before the commencement of the action; here the distribution and exhibition of "Dirtymouth" will almost certainly cause injury to the nearly contemporary distribution and exhibition of Worth's film. In *Rosemont,* the defendants were permitted to make reasonable

use of prior copyrighted statements concerning the actions of the biographical subject (a use to which plaintiffs here concede the defendants are entitled as to Bruce); here, however, defendants seek to utilize the independent, intellectual creation of the biographical subject.

Judge Lumbard illuminated this important distinction in his concurrent opinion in *Rosemont* by saying:

"It has never been the purpose of the copyright laws to restrict the *dissemination of information* about persons in the public eye even though those concerned may not welcome the resulting publicity. *It is the purpose of those laws to give reasonable protection to the product of an author and his manner of expression where the author's proper interest in the product might suffer thereby.*" (Emphasis added.) Rosemont Enterprises v. Random House, supra, 366 F.2d at 311.

Here what is sought is not restriction of the dissemination of information about Bruce, but reasonable protection of his creative work.

### IV. *The Propriety of an Injunction*

Although the plaintiffs have established a prima facie case of infringement, it remains to be determined whether a preliminary injunction is the appropriate remedy.

Relying on *Rosemont* and such cases as American Metropolitan Enterprises of New York, Inc. v. Warner Bros. Records, Inc., 389 F.2d 903 (2d Cir. 1968), as well as the traditional reluctance of the courts to grant an injunction where other remedy is sufficient, the defendants argue that should the plaintiffs prevail they could be made whole in damages and that a preliminary injunction should not be granted.

 While defendants are, of course, correct in their view that the courts should not enjoin preliminarily unless no other adequate remedy exists, nevertheless it is equally clear that the courts have found copyright infringement, particularly of dramatic works, to be an injury against which a preliminary injunction is often the only effective protection. It is the established law of this Circuit that upon the showing of a prima facie case of copyright infringement, a copyright owner may be, and usually is, entitled to a preliminary injunction without a detailed showing of irreparable harm. American Metropolitan Enterprises of New York, Inc. v. Warner Bros. Records, Inc., *supra*; Rushton v. Vitale, 218 F.2d 434 (2d Cir. 1955); Concord Fabrics, Inc. v. Marcus Bros., Textile Corp., 296 F.Supp. 736 (S.D.N.Y. 1969); Prestige Floral, etc. v. California Artificial Flower Co., 201 F.Supp. 287 (S.D.N.Y.1962); Uneeda Doll Co. v. Goldfarb Novelty Co., 373 F.2d 851 (2d Cir. 1967); Inge v. Twentieth Century-Fox Film Corp., 143 F.Supp. 294 (S.D. N.Y.1956).

The rule is most clearly applicable to infringements of dramatic works. As the court observed in Inge v. Twentieth Century-Fox Film Corp., *supra*, at 300:

"It is also not amiss to observe that the Second Circuit as long ago as 1914, in the words of Judge Ward, wrote:

' * * * Preliminary injunctions are granted more readily in dramatic than in other cases because the delay involved in waiting for a final decree would generally amount to a denial of justice.' Chappell & Co. v. Fields, [2 Cir.] 1914, 210 F. 864, 866."

Without disputing this rule the defendants nevertheless argue that money damages will make the plaintiffs whole if they prevail. But this is an oversimplification both of the facts and the law. That the showing of "Dirtymouth" contemporaneously with Worth's film will undoubtedly injure the latter is certain, but the measurement of what plaintiffs' damage may have been at the conclusion of trial would be complex, problematical and unscientific. As Judge Levet said in *Inge, supra,* at 301:

"There is no easy way of measuring a comparison of return to the stage pro-

duction under a condition without film competition and that with film competition."

Defendants' reliance on American Metropolitan Enterprises, *supra*, is misplaced. There, the Court of Appeals found that the appellants had "knowingly acquiesced in the use of the copyrighted works," a state of facts which would have warranted the denial of preliminary injunction as a matter of equitable discretion, but which compelled a denial in view of the language of Section 1(e) of the Copyright Act providing that when the owner of a musical copyright acquiesces in the use of the work any other person may make similar use of it. The citation of Dun v. Lumbermen's Credit Association, 209 U.S. 20, 28 S.Ct. 335, 52 L.Ed. 663 (1908), though authoritative, is no more helpful, since it does not deal with the peculiar problems of competition in the dramatic field and antedates the particular requirements of the cinematic era.

Defendants' references to other authorities are not pertinent in the special circumstances of this case.

 For the reasons stated above, the plaintiffs' motion for a preliminary injunction is granted to the extent of restraining defendants from producing, distributing or exhibiting their film "Dirtymouth" so long as it contains any of the material infringing Bruce's work as set forth in the Appendix to this opinion.

In accordance with Rule 52 of the Federal Rules of Civil Procedure, this opinion constitutes the court's findings of fact and conclusions of law.

Settle order on notice.

## APPENDIX

The following listing adopts the enumeration set forth initially in the affidavit of Marvin Worth sworn to on the 12th day of August, 1970, and followed by defendants in the answering affidavit of Herbert S. Altman sworn to on the 2nd day of September, 1970.

| | |
|---|---|
| (i) | Infringement |
| (ii) | Heretofore deleted by defendants |
| (iii) | Factual material not copyrightable |
| (iv) | Infringement |
| (v) | Stock and unoriginal |
| (vi) | Stock and unoriginal |
| (vii) | Heretofore deleted by defendants |
| (viii) | Infringement |
| (ix) | Infringement |
| (x) | Factual material not copyrightable |
| (xi) | Infringement |
| (xii) | Factual material not copyrightable |
| (xiii) | Infringement |
| (xiv) | Infringement |
| (xv) | Heretofore deleted by defendants |
| (xvi) | Stock and unoriginal |
| (xvii) through (xix) | Heretofore deleted by defendants |
| (xx) | Infringement |
| (xxi) | Stock and unoriginal |
| (xxii) | Heretofore deleted by defendants |
| (xxiii) through (xxvi) | Infringement |
| (xxvii) | Factual material as to depiction of trial, except that phrase relating to Dr. Schmuck infringes. Material relating to "friendly drugs" heretofore deleted by defendants |
| (xxviii) | Infringement |
| (xxix) | Heretofore deleted by defendants |

(xxx) Factual material not copy-rightable

(xxxi) through

(xxxvi) Infringement

(xxxvii) Stock and unoriginal

(xxxviii) Infringement

(xxxix) Infringement

(xxxx) Stock and unoriginal

(xxxxi) Heretofore deleted by defendants

(xxxxii) Infringement

(xxxxiii) Statement of fact not copy-rightable

(xxxxiv) Bruce not original source; therefore not copyrightable by Bruce