**L & L WHITE METAL CASTING CORP., Plaintiff,**

v.

**CORNELL METAL SPECIALTIES CORP. and Joseph Cervellione, Defendants.**

No. 71 Civ. 164.

United States District Court, E. D. New York.

June 2, 1972.

As Amended June 7, 1972.

As Amended on, Denial of Rehearing July 18, 1972.

Mark H. Sparrow, of Sparrow & Sparrow, New York City, for plaintiff.

Michael J. Sweedler, of Darby & Darby, New York City, for defendants.

## OPINION

MOORE, Circuit Judge (sitting by designation).

The plaintiff in this action, L & L White Metal Casting Corp. (White Metal), has charged the defendants, Cornell Metal Specialties Corp. (Cornell Metal) and Joseph Cervellione (now Joseph Cornell by change of name), with copyright infringement and unfair competition with respect to eight metal castings. Jurisdiction is premised upon 28 U.S.C. § 1338.[1]

### The Facts

Both White Metal and Cornell Metal are engaged in the design, manufacture and sale of castings for fixtures, pedestals, lamps and furniture. Approximately 50% of the castings are sold "finished," i. e., plated. While the price of an unfinished (raw) casting may vary according to the quantity bought or the delivery schedule, many are less than $1.00 each though some may be sold for as much as $2.50 to $3.00 each.

A new casting is generally produced by first committing an idea for a de-

---

1. It appears that jurisdiction to hear the claim of unfair competition also exists by virtue of 28 U.S.C. § 1332. Plaintiff is a citizen of New Jersey, defendants are citizens of New York and the amount in controversy exceeds the statutory minimum. The presence of this concurrent base of jurisdiction, however, does not affect the outcome of the case.

sign to paper and then having an artist or sculptor build a mold or a series of molds. These molds are ultimately converted into the raw, mass-produced castings. The cost of creating a new mold varies between $200.00 and $600.00. An existing mold may be redesigned for approximately $100.00.

Until recently virtually none of the manufacturers sought to copyright their castings. It was a common practice for one manufacturer to redesign or copy another's castings. Then about 10 years ago, after the manufacturers failed in their attempt to control some of the industry's practices, the plaintiff started to copyright some of its castings. While the plaintiff is apparently not alone in copyrighting its castings, copyrighting is neither an accepted nor common practice in the industry today.

■ According to Mr. Louis Loevsky, secretary-treasurer of White Metal (the plaintiff's primary witness) approximately 50% of the corporation's castings have been copyrighted. Apparently, the plaintiff did not seek to copyright many castings because counsel advised that they could not meet the minimal "originality" requirement of the copyright law. During his testimony documents evidencing the copyrights on the eight castings in issue were introduced.[2]

Mr. Loevsky testified that White Metal first became aware of Cornell Metal's infringing castings in March, 1970, when a salesman informed him of this fact. In July, 1970, a copy of Cornell Metal's catalogue was obtained and the following September, at White Metal's request, a third party bought samples of Cornell Metal's castings. The complaint was filed on February 3, 1971.

Mr. Cornell, president of the defendant corporation, was the defendants' only witness. He testified that none of its castings were copyrighted and that he was generally unaware of copyright practice and procedures. Like many of his competitors, some of his castings were copies of competitors' designs. With respect to the eight castings in question, Mr. Cornell stated that one, known as the "Double Cherub" had been purchased in 1964 from another casting manufacturer who was going out of business and that the other castings were

2. Relevant information regarding the eight castings is as follows:

| White Metal Description | Date of First Publication | Corresponding Cornell Metal Sales No. |
|---|---|---|
| Base #8884 | April 5, 1968 | 1157 (or 1185) |
| Base (or Column) #8881 | March 1, 1968 | 1184 |
| Cherub (or Double Cherub) #8463 | October 22, 1963 | 1126 |
| Holder #8579 | October 2, 1964 | 809 |
| Octagon Base #8670 | October 1, 1965 | 1182 |
| Base 8774 (or 8677) | December 2, 1966 | 1173 |
| Column #8802 | April 7, 1967 | 1308 |
| Break #8828 | October 11, 1967 | 971 |

The defendants have argued that the plaintiff forfeited one of its copyrights because the date contained in the notice of copyright is subsequent to the date of actual publication. Any variance, however, in no way prejudiced the defendants and was less than one year. The court therefore concludes that the plaintiff has complied with the statutory formalities. *Cf.*, Davis v. DuPont de Nemours & Company, 240 F.Supp. 612, 625–626 (S.D.N.Y.1965); 37 C.F.R. § 202.2 (b) (6); Nimmer, *supra*, § 85.3.

added to his line of products from the late fall of 1969 to the early spring of 1970. He claimed that he was not personally responsible for adopting the castings as family difficulties required his attention elsewhere. The decision to adopt these seven castings was made by a manager of the corporation.

According to Mr. Cornell, he first became aware of the possibility that there might be some copyright infringement problems concerning his castings when he was informed of the litigation. Shortly thereafter, he offered to discontinue the sale of all but one of the castings in dispute and offered to pay a reasonable royalty fee to avoid litigation. The attempt to settle was rejected. During these negotiations, the defendants continued to fill standing offers for the castings. All sales ceased during May, 1971, for seven of the castings. The defendants continue to offer the "Double Cherub" for sale.

### Questions of Law

#### "Originality" of the Castings

At the close of the trial, the defendants, for the first time, sought to challenge the validity of some of the copyrights by claiming they were not sufficiently original. All the castings have been examined with care and it is concluded that all of the plaintiff's castings were properly copyrighted. *Cf.*, Alfred Bell & Co. v. Catalda Fine Arts Inc., 191 F.2d 99 (2d Cir. 1951); Herbert Rosenthal Jewelry Corp. v. Grossbardt, 436 F.2d 315, 316 (2d Cir. 1970).

#### Adequacy of Notice

A more substantial question is whether the copyright notice plaintiff imprinted on his castings, © L & L WMC, was adequate under 17 U.S.C. § 19. In pertinent part this section provides:

> The notice of copyright required by section 10 of this title shall consist either of the word "Copyright", the abbreviation "Copr.", or the symbol ©, accompanied by the name of the copyright proprietor. . . .

The issue is whether the letters L & L WMC satisfied the "name" requirement of this first sentence in the section.[3]

In *Herbert Rosenthal, supra,* a similar issue was posed. The question was whether the letters HR satisfied the name requirement. The Court of Appeals held that it did. In so ruling, the Court emphasized

> the evidence that Rosenthal [the plaintiff] has used HR as a trade name or mark since 1945, that it applied for trademark registration on June 1, 1962 and received it on Jan. 29, 1963 (barely three months after the first bee [the copyrighted work] was sold), and that defendants and others in the jewelry trade have known perfectly well that HR referred to Herbert Rosenthal Jewelry Corp. In sum, these factors reveal that Rosenthal has complied with "the substance of what is prescribed in § 19." (pp. 318–319)

In a later case, Puddu v. Buonamici Statuary, Inc., 450 F.2d 401 (2d Cir. 1971), the Circuit Court was again asked to decide whether a set of letters, therein ARP, satisfied the "name" requirement of the section's first sentence. The Court held that it did not. In distinguishing *Rosenthal* the Court stressed that ARP was not a long established and well-known trade name and that ARP

---

3. The second sentence in the section provides that in the case of copies of works specified in subsections (f) to (k), inclusive, of section 5 of this title, the notice may consist of the letter C enclosed within a circle, thus ©, accompanied by the initials, monogram, mark, or symbol of the copyright proprietor: *Provided*, That on some accessible portion of such copies or if the margin, back, permanent base, or pedestal, or of the substance on which such copies shall be mounted, his name shall appear.

Since the castings in question are covered by subsection (g), the plaintiff could have relied upon this short form of notice. It is conceded, however, that *the plaintiff's name as used in this second sentence did not appear on the copyrighted work.*

was not a registered trademark. To overcome these distinctions, Puddu noted that he had filed a state certificate permitting him to do business under the name ARP and that the letters ARP appeared on a few pages in a brochure advertising his line of goods. This proof was held inadequate to establish substantial compliance with the requirements of the statute.

■ In light of the facts of the above cases, it is concluded that the instant case is controlled by *Rosenthal*. While little evidence was offered indicating that L & L WMC was a well-known name in the industry, White Metal has existed as either a company or a corporation for over 35 years in an industry in which there are apparently relatively few established manufacturers.[4] In addition, L & L WMC is a registered trademark, White Metal has filed a state certificate permitting it to do business under these letters and the letters appear on all of its advertising brochures. Substantial compliance with the statute has been established.

A second question with respect to the notice is whether placement of the name within the casting was sufficient. Defendants argue that the notice was not properly affixed to the work as it would be permanently concealed when the finished product was assembled for resale to the public.

■ Defendants are correct in asserting that notice which is permanently covered is inadequate. Such notice is deficient because it fails to apprise anyone, seeking to copy the work, of the copyright notice. Cf., 37 C.F.R. § 202.-2(b)(7); Coventry Ware, Inc. v. Reliance Picture Frame Co., 288 F.2d 193 (2d Cir.), cert. denied, 368 U.S. 818, 82 S.Ct. 34, 7 L.Ed.2d 24 (1961); Uneeda Doll Co. v. Goldfarb Novelty Co., 373 F.2d 851 (2d Cir. 1967), cert. dismissed, 389 U.S. 801, 88 S.Ct. 9, 19 L.Ed.2d 56 (1968). However, this general rule is not applicable as notice on the castings was not permanently covered.

■ If the defendants had only copied the finished works they could have then argued that there was no possibility the notice could be seen. Here, however, only the raw castings were copied. The notice was plainly visible to anyone seeking to copy the castings.

The defendants also argue that the notice could have been placed on a more accessible portion of the castings. The Court has examined the castings and concludes that the defendants have not carried their burden in this respect. *Cf.,* Peter Pan Fabrics, Inc. v. Martin Weiner Corp., 274 F.2d 487 (2d Cir. 1960); H. M. Kolbe Co. v. Armagus Textile Co., 279 F.2d 555 (2d Cir. 1960) (Friendly, J., dissenting opinion).

### Alleged Abandonment

The defendants attempted to prove that the copyrights had been abandoned since the plaintiff permitted uncopyrighted "copies" to circulate and the plaintiff published an improperly copyrighted catalogue which depicted the castings. Both contentions are without merit.

■ There was no evidence indicating any intent to abandon the copyright, cf., M. Nimmer, On Copyright, § 146 (perm. ed. rev. repl. 1971), and there was no evidence that the plaintiff permitted many unauthorized and uncopyrighted "copies" to circulate over a long period of time. *Compare,* Stuff v. E. C. Publications, Inc., 342 F.2d 143 (2d Cir.), cert. denied, 382 U.S. 822, 86 S.Ct. 50, 15 L.Ed.2d 68 (1965). Also, while the copyright notices on some of the catalogues were not technically accurate, this does not divest the plaintiff of his interest in the copyrighted castings. Rushton v. Vitale, 218 F.2d 434 (2d Cir. 1955).

---

4. The testimony concerning the industry's attempt at self-regulation and the testimony about the mutual customers of the parties and the defendants' pre-trial brief all indicate that there are between thirty and forty established manufacturers of castings.

## Liability

As the Cornell Metal castings are virtually identical to those of White Metal, there can be no doubt as to infringement. The only question is the extent to which there should be any mitigation of damages because some of the acts of infringement were innocent.

Both defendants established that their initial infringement of one of the castings was innocent. The mold for this casting, the "Double Cherub", was purchased from another manufacturer in 1964. While the purchase was subsequent to the effective date of the copyright and does not undermine the validity of the copyright, it is concluded that neither defendant was aware of the plaintiff's copyright on the original casting.

Mr. Cornell also proved that he did not actually place the other seven castings in production. While this fact does not insulate him from liability since he had "the right and ability to supervise the infringing activity and also ha[d] a direct financial interest in such activities", Gershwin Publishing Corp. v. Columbia Artists Man., Inc., 443 F.2d 1159, 1162 (2d Cir. 1971), it is clear that his involvement in the activities was initially innocent.

With respect to the liability of Cornell Metal, innocent infringement was established as to one casting in addition to the "Double Cherub." Apparently, any copy of a casting will shrink approximately 5⁄16 of an inch for every foot in the original. A comparison of one of the defendants' castings with plaintiff's corresponding casting clearly indicates "double shrinkage." As there was no evidence that defendants made both copies, it is concluded that this casting was not copied directly from the original and that the initial infringement of this casting was innocent.[5]

While the above acts of infringement were initially innocent, the defendants lost their cloak of innocence when they continued to sell the castings after they received actual notice of the infringement. In computing damages, this fact will also be considered.

## The Claim of Unfair Competition

As there was virtually no evidence to indicate confusion as to source of origin or "palming off", plaintiff's claim of unfair competition can be dismissed as being without merit. Cf., Sears Roebuck & Co. v. Stiffel Co., 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); Compco Corp. v. Day-Brite Lighting Co. Inc.; 376 U.S. 234, 84 S.Ct. 779, 11 L.Ed.2d 669 (1964); *Puddu, supra,* 450 F.2d at 402 n. 1.

## Damages

Section 101(b) of Title 17 provides that an infringer shall

> pay to the copyright proprietor such damages as the copyright proprietor may have suffered due to the infringement, as well as all the profits which the infringer shall have made from such infringement . . . or in lieu of actual damages and profits, such damages as to the court shall appear to be just, and in assessing such damages the court may, in its discretion, allow the amounts as hereinafter stated . . . [not relevant here] and such damages shall in no other case exceed the sum of $5,000. . . . [However,] the limitation as to the amount of recovery [shall not] apply to infringements occurring after the actual notice to a defendant, either by service of process in a suit or other written notice served upon him.

With respect to the defendants' profits, the evidence established that gross sales on the infringing castings was approximately $60,000 and that the defendants' profit ratio was approximately 2½% annually. The court therefore finds that the defendants profited by $1,500 as a result of the infringements.

---

5. It was virtually undisputed that in addition to the contested "double shrinkage" of the one casting discussed above, "double shrinkage" was evident in three other castings.

At trial, the parties attempted to challenge the accuracy of these figures. However, as the parties, throughout the course of this litigation, in effect, accepted the accuracy of the figures and as no evidence of any substance was introduced indicating that the figures were not correct, the court finds the challenges to be without merit.

While the extent of the defendants' profit was established, the plaintiff's damage claims were highly speculative.

In the attempt to establish the damages suffered by White Metal, Mr. Loevsky testified that some of the plaintiff's customers had switched their orders for some of the eight castings to Cornell Metal during the period of the infringement and that White Metal's manufacturing facilities were not operating at full capacity. He also testified that if the defendants had not sold the infringing castings, the plaintiff would have made every one of the sales at a 40% profit.

■ This evidence is insufficient to determine the damages suffered by the plaintiff as a result of the acts of infringement. There was no evidence as to how many castings the "lost" customers had purchased prior to ordering castings from Cornell Metal and no evidence indicating the quantity of their purchases from Cornell Metal; no diminution of sales was shown. There was also no evidence indicating that Cornell Metal's other customers would have purchased the castings from the plaintiff if there had been no infringement. In fact, the little evidence there is on this issue indicates that White Metal would not have been able to make all of Cornell Metal's sales. White Metal's castings are approximately one third more expensive than Cornell Metal's. Even conceding that a difference in quality would justify the price differential, it must be concluded that the castings were not fungible. *Cf.,* Alouf v. Expansion Products, Inc., 417 F.2d 767 (2d Cir. 1969). In light of these facts, the Court is compelled to rely upon the "in lieu of" clause to determine "just" damages.

White Metal has carefully prepared a "Break-Even Chart," the hypothesis of which is that the break-even point of its net sales and total costs is $2,163,000 and that above this point "the profit zone rises dramatically with sales." Profits in real business life, as so many corporate statements reveal, cannot be measured by straightline charts on the assumption that the same ratio of profits will continue. Many companies report increased sales and diminished profits and vice versa. And so here. The sales and profits figures which White Metal urges be used as a base for a calculation of damages are far too speculative for a fair or just assessment of damages. The only figure capable of reasonable ascertainment is the amount of Cornell Metal's profits. White Metal's potential sales of the infringing costs and profits, if any, therefrom are too surrounded in its claims by "if's", "possibly's," and "probably's" to be used in fixing a damage figure. The Court is certain, however, of the conclusions of fact that White Metal's copyrights were infringed. For these infringements, White Metal is entitled to damages.

■ In computing the damages to be assessed, the following factors have been taken into consideration: the defendants' profits, the relative degrees of innocence of both defendants,[6] the fact the court is not limited by the statutory maximum, the plaintiff's higher profit margin based on higher prices, the number of infringing castings sold by the defendants, and the fact that plaintiff permitted the acts of innocent infringement to continue longer than was necessary. It is therefore concluded that $3,500 should be assessed in damages. In addition, $1,500 is awarded as a reasonable attorney's fee together with

---

6. The different degrees of innocence between the two defendants is found to be inconsequential and of no effect.

costs. 17 U.S.C. § 116. Let judgment be entered accordingly.

■ Defendants are jointly and severally liable for the sum of damages assessed. Defendants are also permanently enjoined from manufacturing or selling any of the eight castings. Defendants are required to deliver up for destruction all infringing copies and all models and molds used to make such copies.

This opinion states the court's findings of fact and conclusions of law in compliance with Rule 52 of the Federal Rules of Civil Procedure.