Raymond **ROHAUER** and Cecil W. Hull,
Plaintiffs,

v.

**KILLIAM SHOWS, INC.,** et al.,
Defendants.

No. 71 Civ. 4183.

United States District Court,
S. D. New York.

Aug. 8, 1974.

Schwartz, Burns, Lesser & Jacoby, New York City (Herbert P. Jacoby, Robert E. Suggs, New York City, of counsel), for plaintiffs.

Abraham M. Fuss, New York City, for defendants Killiam Shows, Inc., Paul Killiam, and Educational Broadcasting Corp.

Nicholas A. D'Onofrio, New York City (Alexander M. Selkirk, Jr., New York City, of counsel), for defendant Bowery Savings Bank.

## OPINION

BAUMAN, District Judge.

This is an action for copyright infringement brought pursuant to the Copyright Act, 17 U.S.C. § 1 et seq. The action was tried before this court, sitting without a jury, and what follows constitutes my findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.[1]

Some time prior to May 15, 1925, one Edith Maude Hull, a British subject, wrote a novel entitled "The Sons of the Sheik". The work was published in the United States on or about May 15, 1925 by the firm of Small, Maynard & Co., which duly registered the work in the United States Copyright Office and received thereby a Certificate of Copyright Registration bearing the number A:855221. On or about November 23, 1925, Small, Maynard transferred the United States Copyright to the author. By agreement dated December 7, 1925, she assigned the motion picture rights to one Joseph H. Moskowitz. The agreement provided, in pertinent part, that "[t]he Seller hereby grants, sells and assigns to the Purchaser all the motion picture rights in and to the said story for the entire world, together with the sole and exclusive right to make motion picture versions thereof . . . ." The agreement further provided that the author would procure the renewal of the copyright prior to its expiration and would thereupon assign the motion picture rights for the renewal term to Moskowitz.

The succeeding histories of the novel and motion picture diverge at this point, and it will be useful to consider each separately. Edith Hull, the author, died in 1943. On May 22, 1952, the United States Copyright in the novel was renewed in the name of Cecil Winstanley Hull, a plaintiff herein, who was the author's sole surviving child. A Certificate of Renewal Copyright was duly issued in her name, bearing the number R:95176. On May 6, 1965, Cecil Hull assigned to Raymond Rohauer, plaintiff herein, "all of [Hull's] right, title and interest (if any) in and to the motion picture and television rights of every kind and character throughout the world and in all languages in a certain literary and/or dramatic property entitled 'Sons of the Sheik' . . . ." This assignment was registered in the United States Copyright Office on May 18, 1965.

---

1. The underlying facts are largely undisputed; indeed, the brief recitation of the evidence that ensues is based principally on an extensive stipulation of facts to which all parties agreed.

Pursuant to the December 7, 1925 agreement between Edith Hull and Joseph Moskowitz, a motion picture entitled "The Son of the Sheik" starring Rudolph Valentino was produced and released for exhibition in the United States in 1926. It is undisputed that the motion picture is based on the Hull novel.[2] On August 24, 1926, the picture was registered in the Copyright Office by and in the name of Feature Productions, Inc., as assignee of Moskowitz Its certificate bore the registration number L:23046. This copyright was renewed on March 18, 1954 by and in the name of Art Cinema Associates, Inc., the then proprietor of the copyright. The renewal certificate was numbered R:127185. By agreement dated September 14, 1961 Art Cinema Associates, along with Mrs. Emil Jensen and Walton & Co., sold their interests in the motion picture, including the renewal copyright, to Gregstan Enterprises, Inc. Some time thereafter, Gregstan assigned all such interests, including the renewal copyright, to Killiam Shows, Inc., one of the defendants. Paul Killiam, another defendant, is and was an officer, director and sole stockholder of Killiam Shows.

On July 13, 1971, the motion picture was shown on television station WNET, which operates on Channel 13 in the New York Metropolitan area and which is owned by the Educational Broadcasting Corporation (hereinafter "Broadcasting"), another defendant. The showing was made possible by a grant of $75,000 from the Bowery Savings Bank, also a defendant, which was underwriting a series of 12 motion pictures entitled "The Silent Years", all of which were to be shown on WNET. The film required for this exhibition was made by Broadcasting from a print made available to it by Killiam Shows; the consideration paid for the use of the print was furnished to Broadcasting by Bowery.

The July 13 showing occurred without any license from plaintiffs Rohauer or Hull.[3] Several years earlier, by letter of counsel dated May 12, 1966, Rohauer had informed Killiam of his assignment from Cecil Hull and advised him that any showing of the picture would constitute an infringement of his rights. On July 12, 1971, the day before the first television showing, Rohauer's counsel informed Broadcasting that the scheduled showing would constitute an infringement of rights granted him by Cecil Hull. The instant action was commenced on September 22, 1971, and claimed copyright infringement based on the July 13 showing.

After the action was commenced, the film was shown twice more on Channel 13 as part of "The Silent Years" series: on October 11 and October 16, 1971. By agreement of the parties, the complaint is deemed amended to include the additional showings as alleged acts of infringement.

Also relevant here is a brief recitation of the history of the motion picture's use prior to July 13, 1971. It is undisputed that between 1952 and 1965 Rohauer was responsible for numerous showings of the motion picture, a print of which he had purchased from the president of Art Cinema Associates. It is also undisputed that the motion picture had been shown extensively in the

2. Neither the novel nor the motion picture was produced in evidence. I have not read the novel, and I have not seen the motion picture since the time I was taken by my parents as a young boy. The parties, however, have stipulated as follows: "The photoplay embodies incidents portrayed in the work, utilizes the characters created by the Author appearing in and acting out sequences from the work, and was and is a dramatic version of the work in motion picture form." (Stipulation of Facts, ¶ 13.)

3. It might be noted at this juncture that Cecil Hull is a nominal party plaintiff and has been joined solely because she is the record owner of the renewal copyright to the novel. Independent Wireless Telegraph Company v. Radio Corporation of America, 269 U.S. 459, 46 S.Ct. 166, 70 L.Ed. 357 (1926). Miss Hull has been confined to a nursing home in England since 1969, and her joinder in this action has been authorized by the Court of Protection in Great Britain.

United States as part of a series entitled "Silents Please" which began in 1960; Killiam Shows or its predecessors in interest controlled by Killiam had furnished the print for such showings. The film was also shown on television in Great Britain between 1962 and 1966 as part of the "Silents Please" series. There is no evidence that Cecil Hull ever objected to any of these uses, or that she was aware of them.

## I

As the foregoing statement of facts indicates, both sides claim ownership of the motion picture rights to "The Son of the Sheik". The principal legal question which the case presents, then, is whether the grant of the motion picture rights from Edith Hull to Joseph Moskowitz, to which Killiam Shows has succeeded, constituted proper authorization for the showings which took place over Channel 13. Defendants, of course, claim that it does. Plaintiffs, however, argue that the subsequent renewal of the copyright by Cecil Hull following Edith Hull's death extinguished any rights which Moskowitz and his successors in interest acquired. My understanding of the applicable authorities convinces me that plaintiffs' view is correct.

It has been held in this Circuit that when an author of a copyrighted work dies prior to the expiration of the copyright term, and the next of kin applies for renewal before the term expires, he acquires "a new and independent right in the copyright, free and clear of any rights, interests, or licenses attached to the copyright for the initial term." Fitch v. Shubert, 20 F.Supp. 314 (S.D. N.Y.1937); G. Ricordi & Co. v. Paramount Pictures, 189 F.2d 469 (2nd Cir. 1951); Silverman v. Sunrise Pictures Corp., 273 F. 909 (2nd Cir. 1921). See also Bricker, "Renewal and Extension of Copyright", 20 So.Calif.L.Rev. 23 (1955) at pp. 27–31. I also find highly persuasive the views of the leading text writer in this field: "If the author (or other assignor of the renewal expectancy) is

not living when the renewal rights vest, then those persons who by statute succeed to the renewal rights are not bound by any assignment executed by the author (or by any assigning member of a prior renewal class) so that the assignee takes nothing." Nimmer on Copyright, § 117.3.

Nimmer has also addressed the precise question with which I am confronted here:

"A motion picture producer whose rights in the 'underlying' work terminate at the expiration of the original term may not thereafter make additional 'prints' of the film, nor may he reproduce a new motion picture based upon the same work. Both of such acts would constitute unauthorized copying. A more difficult question is whether the mere exhibition in theatres or on television of previously created film prints constitutes an infringement of copyright in the underlying work. It would seem that such conduct would constitute an infringement of either the right to make copies, the right to make other versions, the right to dramatize a non-dramatic work, or the right to perform a 'transcription or record' of a non-dramatic literary work." *Nimmer*, supra, § 118.

Defendant argues, as I understand it, that the motion picture is an independently copyrighted derivative work, the use of which cannot be controlled by the holder of the renewal copyright in the underlying work. Although the view is hardly illogical, I can find no support for it in the applicable precedents; as I have already noted, such precedents as do exist repudiate this argument. One case that directly considered the supposed "independence" of a derivative work is Sunset Securities Company v. Coward-McCann, Inc., 47 Cal.2d 907, 306 P.2d 777 (1957), reversing 297 P.2d 137 (Dist.Ct. of Appeal, 2nd Dist. 1956). In that case a publisher which was the proprietor of a duly copyrighted novel sold the motion picture rights to a film company under an agreement which gave

the purchaser such rights for a ten year period. The agreement further provided that all rights would revert to the publisher at the end of that period unless the purchaser paid an additional sum. A motion picture was duly made, and, after several proceedings not relevant here, the purchaser's successor in interest brought an action against the publisher to "quiet title" to the motion picture and to confirm its right to exploit it beyond the expiration of the ten year period. The District Court of Appeal accepted plaintiff's argument, and in so doing employed reasoning strikingly similar to that of the defendants here: "the film 'Ruthless' was actually made and copyrighted within the ten-year period. The film is a separate entity from 'Prelude to Night' [the novel]. It may be separately copyrighted. 17 U.S.C.A. § 5(l). The agreement conveyed to [the purchaser] the right to copyright the film. As a copyright endures for twenty-eight years . . ., defendant's contention that the copyright taken out on 'Ruthless' would revert to defendant at the end of ten years is implausible." 297 P.2d at 140. The California Supreme Court unanimously reversed this holding. Although its opinion relied principally on the construction of the original agreement, the court clearly rejected the lower court's theory that motion picture rights, once granted, cannot revert to the proprietor of the underlying work if a motion picture is made and copyrighted by the grantee.

Plaintiff also finds support for his position in the proposed revision of the Copyright Law which has been before Congress since 1965. § 203(b)(1) of a recent incarnation of that bill[4] provides as follows:

"A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant."

Although this might well be deemed an admirable statement of what the law should be, it is scarcely persuasive of what the law is. As our Court of Appeals has noted, the proposed revisions of the Copyright Act command adherence only insofar as "the result which the proposed legislation would compel is not precluded in any way by the decisions rendered under the present Copyright Act." Goodis v. United Artists Television, Inc., 425 F.2d 397 (2nd Cir. 1970). My reading of cases such as *Fitch* and *Ricordi* convinces me that they are inconsistent with proposed § 203(b)1. I therefore can accord it no weight, and must reject defendants' argument that the owner of an independently copyrighted derivative work may continue to exploit it beyond the original term of the underlying work.

II

My discussion in the preceding section suffices to establish that, save for the affirmative defenses to be considered below, plaintiffs' copyright was infringed by the showings of "The Son of the Sheik". The fact that the showings were broadcast over Broadcasting's facilities with the aid of a print furnished by Killiam Shows establishes the liability of those two defendants. It is well settled—and not disputed by Broadcasting here—that a broadcasting company which broadcasts infringing material over its facilities is liable for infringement. Bradbury v. Columbia Broadcasting System, Inc., 287 F.2d 478 (9th Cir.), cert. dismissed, 368 U.S. 801, 82 S.Ct. 19, 7 L.Ed.2d 15 (1961). A more difficult question is whether defendants Paul Killiam and Bowery Savings Bank can be held liable as contributory infringers, and it is to that question I now turn.

It is agreed that Killiam is an officer, director, and sole stockholder of Killiam Shows. From this plaintiffs

4. S.1361, introduced in the 1st Session of the 92nd Congress.

argue that he is the *"alter ego"* of Shows, or, as they phrase it, that he is "the defendant Shows doing business in corporate form." Plaintiffs claim further that Killiam "completely dominates and controls its [the corporation's] operations and is the sole beneficiary of its acts." Unfortunately, there is nothing in the record to support any of these assertions; all that is before me is the statement in the stipulation of facts that Killiam is an officer, director, and sole stockholder of Shows. At trial, plaintiffs rested without introducing any evidence of the extent of Killiam's activities. I can thus scarcely infer that Killiam "completely dominates and controls" the activities of the corporate defendant. Nor, I have concluded, can I find him liable as a contributory infringer.

A contributory infringer has been defined as "one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." Gershwin Publishing Corporation v. Columbia Artists Management, Inc., 443 F.2d 1159 (2nd Cir. 1971). Corporate officers will be held liable for the infringing acts of the corporation "if they personally participated in the acts constituting infringement." H. M. Kolbe Co. v. Shaff, 240 F.Supp. 588 (S.D.N.Y.), affd., 352 F.2d 285 (2nd Cir. 1965); Hagemeyer v. Insect-O-Lite Co., Inc., 291 F.2d 696 (6th Cir. 1961). A recent gloss on the meaning of personal participation has been provided by Judge Moore, sitting by designation in the Eastern District of New York. He held that the president of an infringing corporation could be held liable simply because "he had the right and ability to supervise the infringing activity and also had a direct financial interest in such activities." L & L White Metal Casting Corp. v. Cornell Metal Specialties Corp., 353 F.Supp. 1170 (E.D.N.Y.1972).

Courts have rarely imposed liability on a corporate officer for the infringing acts of the corporation without some inquiry into either the officer's actual participation or, at the very least, into the nature of his function within the corporation. In Shapiro, Bernstein & Co. v. Gabor, 266 F.Supp. 613 (S.D.N.Y.1966), the court held that "[w]hether defendant [the corporation's president] did personally participate can only be determined after resolution of that issue of fact upon a trial." In other cases in which corporate officers have been found liable, these findings have been based on careful evidentiary determinations regarding the scope of the officer's role in the infringement. See, e. g., Morser v. Bengor Products Co., 283 F.Supp. 926 (S.D.N.Y.1968); Warner Bros.-Seven Arts, Inc. v. Kalantzakis, 326 F.Supp. 80 (S.D.Tex.1971). In the instant case, I am unwilling to impose liability on defendant Killiam based on nothing more than speculation regarding his participation in the corporation's activities. That he is officer, director, and sole shareholder does not lead ineluctably to the conclusion that the corporation is his *alter ego*. I am unaware of any copyright infringement case that has imposed liability on a corporate officer on such a meager factual record. Accordingly, the action is dismissed as against defendant Paul Killiam.

### III

With regard to the liability of the Bowery Savings Bank, I should note at the outset that I attach no weight to its self styled role as an "underwriter" rather than a "sponsor" of the televised showings. Programs shown on educational television stations, such as Channel 13, do not have sponsors in the conventional sense; rather, a company which has contributed toward the presentation is usually permitted a brief and rather sedate announcement of its contribution, which usually appears at the end of the program. Here, in addition, the entire "Silent Years" series was extensively advertised in the press, on public buses, and in other media; all such advertising bore Bowery's name. It is also conceded that Bowery distributed posters bearing its name as well as

a still photograph from the motion picture. Although Bowery was unable to engage in the crasser forms of self promotion to which commercial television has accustomed us, I find that its participation in the financing and promotion of the series qualifies it as a sponsor.

■■ A sponsor will be held liable for copyright infringement if it had the power to supervise and control the content of the programs. Davis v. E. I. DuPont de Nemours & Co., 240 F.Supp. 612 (S.D.N.Y.1965); Bevan v. Columbia Broadcasting System, Inc., 329 F.Supp. 601 (S.D.N.Y.1971); Nimmer, supra, § 134.1. Plaintiffs concede that Bowery was unaware of the infringement at the time of the July 13, 1971 showing of the motion picture and accordingly do not seek to impose liability for that particular act. They do contend, however, that Bowery is liable for the October 11 and October 16 showings. By that time the instant action had already been filed, and Bowery's lawyers had received a copy of a letter from plaintiffs' counsel to Broadcasting's counsel warning against any further showings. Plaintiffs argue that Bowery, having received such notice, must be found to be a knowing and deliberate participant in the infringement.

Although Bowery was unquestionably apprised of the infringement charges, I am not satisfied that their activity reaches the "control and supervision" standard of Davis and Bevan. Again, as with Killiam, the problem is largely one of proof. Plaintiffs have offered some evidence of Bowery's advertising activities; they have not, in my view, offered sufficient evidence of the nature of Bowery's relationship with Broadcasting or of the extent of its supervision over the series. The facts of Davis v. E. I. DuPont de Nemours & Co., supra, offer an instructive contrast. It was there established that the sponsor's approval was required at several stages in the production of the television program. Because the sponsor saw the first draft of the television script and participated in story conferences, the court found it had the power to determine the content of the program and that it had exercised that power. It was not, the court concluded "merely an advertiser buying time on a program produced by a station over whom it had no control." 240 F. Supp. at 632. On the record before me, I have no way of knowing how active or passive Bowery was with regard to the production of "The Silent Years". I cannot determine, for example, whether it participated in selecting the films for the series or whether it simply agreed to finance a package already devised by Broadcasting or some third party. Davis suggests that such determinations are highly relevant to deciding whether a sponsor is a contributory infringer. Because plaintiffs have failed to sustain their burden of proof, the action is dismissed as against defendant Bowery.

## IV

I shall now consider the various affirmative defenses asserted by the defendants. The first of these is abandonment. Nineteen years elapsed between 1952, the year Cecil Hull renewed the copyright to "The Sons of the Sheik" and 1971, the year this action was commenced. During that interval the motion picture was shown frequently on television in both Great Britain and the United States, but at no time did either Cecil Hull (prior to 1965) nor Rohauer (after 1965) raise any objection or make any attempt to restrict the motion picture's exhibition. This inaction, defendants contend, amounted to an abandonment of the copyright.

■■ It is well recognized, however, that abandonment must be manifested by some overt act indicative of an intent to surrender rights in the copyrighted work and to allow the public to copy it. Mere inaction is not a sufficient manifestation of such intent. National Comics Publications Inc. v. Fawcett Publications Inc., 191 F.2d 594 (2nd Cir. 1951); Marvin Worth Productions v. Superior Films Corp., 319 F.Supp. 1269 (S.D.N.Y.1970); Nimmer, supra, § 146. A case which closely parallels this one is Hamp-

ton v. Paramount Pictures Corporation, 279 F.2d 100 (9th Cir. 1960), cert. denied, 364 U.S. 882, 81 S.Ct. 170, 5 L.Ed. 2d 103 (1960). In that case plaintiff's predecessor in interest, the assignee of a copyrighted motion picture, had licensed Kodascope in 1927 to produce prints of this film, as well as others, for "non-theatrical exhibitions". After 1930, however, Kodascope rented and sold such prints without restriction. Defendant purchased a print of the motion picture in question and, beginning in 1942, exhibited it, along with others in his theatre. Plaintiff did not object to these showings until 1954. The Ninth Circuit held that despite a lapse of 27 years, plaintiff had not abandoned the copyright. Following *National Comics,* supra, it held that abandonment required some overt act indicative of an intent to surrender. It further concluded that "[e]vidence of such an overt act is here totally lacking. There was at most lack of action." 279 F.2d at 104. The most that can be found in the present record is a lack of action as well, and I therefore find the defense of abandonment unavailing.[5]

■ Defendants' trial brief also contains what appears to be a half-hearted reference to the defense of estoppel. The reluctance with which this argument is pressed is thoroughly justified. The Ninth Circuit in *Hampton* has accurately stated the elements of the defense: (1) the party to be estopped must know the facts of the defendant's infringing conduct; (2) he must intend that his conduct be acted on or must so act that the party asserting the estoppel (usually the defendant) has a right to believe it is so intended; (3) the defendant must be ignorant of the true

facts; (4) the defendant must rely on the plaintiff's conduct to his injury. See also Nimmer, supra, § 147. To state the defense is to demonstrate its inapplicability. There is no evidence that Cecil Hull, for example, knew of the unauthorized showings of the motion picture between 1952 and 1965.[6] Nor is there any evidence that either Cecil Hull or Rohauer intended their inaction to permit those such as defendants to show the motion picture without authorization. Nor, finally, is there any indication that the defendants relied on plaintiffs' inaction to their detriment. Indeed, the record shows that defendants persisted in showing the motion picture on two occasions even after they had been warned that such action would infringe plaintiffs' copyright. The defense of estoppel must therefore fail.

V

■ The next defense asserted has doubtless been dredged up from the antique maxims of equity. It is contended that plaintiffs should not be permitted to prevail because they came into court with unclean hands. The essence of this charge, it seems, is that Rohauer frequently exhibited the motion picture prior to 1965 without obtaining a license from Hull, and thereby engaged in acts of infringement similar to those of which he now accuses the defendants.

Nimmer has noted that the defense of unclean hands "is recognized only rarely, when the plaintiff's transgression is of serious proportions and relates directly to the subject matter of the infringement action." Nimmer, supra, § 149.2. The requirement that the "transgression" relate to the subject matter of the litigation is susceptible of two interpre-

---

5. Defendants' reliance on Stuff v. E. C. Publications, Inc., 342 F.2d 143 (2nd Cir. 1965), is misplaced. There plaintiff, the owner of a copyright on a caricature, was found to have abandoned the copyright because he "authorized or acquiesced in" the wide circulation of a large volume of nearly identical prints that did not bear his copyright notice. As I read the case, the court's decision turned on the absence of proper notice on the prints, and plaintiff's apparent acquiescence in such omission. There is no showing of a comparable absence of notice in the instant action.

6. Defendants have so stipulated. See Stipulation of Facts, ¶ 33.

tations, neither of which aids the defendants' cause in the slightest. In Bentley v. Tibbals, 223 F. 247 (2nd Cir. 1915), the unclean hands defense was held inapplicable because the "transgression" of which the plaintiff stood accused did not harm the defendant or prejudice him in any way. In Jacoby-Bender v. Jacques Kreisler Manufacturing Corporation, 287 F.Supp. 134 (S.D. N.Y.1968), the court stated that unclean hands would bar the plaintiff only if he was attempting to charge the defendants with liability for an act in which he himself had participated. The *Bentley* view of the defense completely absolves Rohauer: there is no claim that his showings of the motion picture harmed the defendants. At most, they injured his co-plaintiff, Cecil Hull. Nor do the defendants fare any better by invoking *Jacoby-Bender*, for it is clear that Rohauer did not participate in or abet any of the acts of infringement with which defendants are charged.

A principle frequently applied to the unclean hands doctrine in patent cases seems equally applicable here. It has been held that defendants cannot avail themselves of the unclean hands doctrine if plaintiff has abandoned its objectionable practices prior to the commencement of the action. Q-Tips, Inc. v. Johnson and Johnson, 108 F.Supp. 845 (D.N.J.1952), affd., 206 F.2d 144 (3rd

Cir. 1953), cert. denied, 346 U.S. 867, 74 S.Ct. 106, 98 L.Ed. 377 (1953); Eastern Venetian Blind Co. v. Acme Steel Co., 188 F.2d 247 (4th Cir. 1951). Here, any wrongful conduct in which Rohauer engaged ceased in 1965, when he purchased the motion picture rights from Cecil Hull. In sum, I find nothing in plaintiffs' behavior so egregious [7] as to warrant a dismissal based on the dubious doctrine of unclean hands.[8]

## VI

Defendants next argue that even if their showings did infringe plaintiffs' copyright, such showings constituted a "fair use" of plaintiffs' work. Our Court of Appeals considered the nature and justification of the fair use doctrine in Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303 (2nd Cir. 1966), cert. denied, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967). Fair use, it stated "is a privilege in others than the owner of a copyright to use the copyrighted material in a reasonable manner without his consent, notwithstanding the monopoly granted to the owner." See Ball, Copyright and Literary Property, 260 (1944). Citing Berlin v. E. C. Publications, Inc., 329 F.2d 541 (2nd Cir. 1964), it noted that "courts in passing upon particular claims of infringement must occasionally subordinate the copyright holder's inter-

---

7. Nimmer emphasizes, in § 149.2 that the doctrine should be invoked only when plaintiff has engaged in serious acts of wrongdoing. By way of illustration he mentions: falsification of a court order; falsification of evidence; misrepresentation by plaintiff of the scope of his copyright; the procuring of information about defendant's work by improper means. Each of these represents a substantial affront to the legal process itself; by no stretch of the imagination could Rohauer's activities be so characterized.

8. In their trial memorandum defendants rely on another action which they also claim to be indicative of unclean hands. In the 1925 assignment of rights by Edith Hull to Moskowitz, the seller undertook to procure the renewal of the copyright and thereupon to assign the motion picture rights to the purchaser for the renewal term. Elsewhere in

the document it was stated that the agreement would bind the heirs, successors and assigns of the original parties. Defendants allege that Cecil Hull, her mother's heir and successor, breached her obligation to assign the motion picture rights in the renewal term to Killiam, Moskowitz' successor. This "breach of contract", the argument runs, establishes the unclean hands of the plaintiffs.

This overlooks the doctrine, alluded to earlier, that those who succeed to the renewal rights are not bound by the original copyright proprietor's prior assignment of renewal rights. Miller Music Co. v. Charles N. Daniels, Inc., 362 U.S. 373, 80 S.Ct. 792, 4 L.Ed.2d 804 (1960); Shapiro Bernstein and Co. v. Jerry Vogel Music Co., 161 F.2d 406 (2nd Cir. 1946). Cecil Hull has thus breached no obligation to the defendants, and cannot be accused of unclean hands under this theory.

est in a maximum financial return to the greater public interest in the development of art, science and industry." Hence whether an infringer will be entitled to the benefit of the fair use privilege depends on the nature of the infringing work; the most important consideration is whether the distribution of such work "would serve the public interest in the free dissemination of information." Not surprisingly, therefore, the fair use privilege has been most frequently extended to works in the fields of science, law, medicine, history and biography. See also, Public Affairs Associates, Inc. v. Rickover, 268 F.Supp. 444 (D.D.C.1967); Eisenschiml v. Fawcett Publications, Inc., 246 F.2d 598 (7th Cir.), cert. denied, 355 U.S. 907, 78 S.Ct. 334, 2 L.Ed.2d 262 (1957).

 The factors bearing upon a court's inquiry into a fair use defense have been well stated by Judge Lasker in Marvin Worth Productions v. Superior Films Corporation, 319 F.Supp. 1269 (S.D.N.Y.1970). The court must determine: (1) was there a substantial taking, qualitatively or quantitatively; (2) if there was, did the taking materially reduce the demand for the original copyrighted property; (3) does the distribution of the infringing material serve the public interest in the free dissemination of information; (4) does the preparation of the material require the use of prior materials dealing with the same subject matter. 319 F.Supp. at 1274.

A consideration of but one of these factors is sufficient to dispose of defendants' claim. There is no discernible public interest in the dissemination of "The Son of the Sheik" sufficient to justify the infringement. Even a cursory examination of those cases in which courts have recognized a significant countervailing public interest in infringing material indicates how far short defendants' argument falls. In Time Incorporated v. Bernard Geis Associates, 293 F.Supp. 130 (S.D.N.Y.1968), sketches based on a film of President Kennedy's assassination were found justified as a fair use because of the "public interest in having the fullest information available" on that event. In Meeropol v. Nizer, 361 F.Supp. 1063 (S.D.N.Y.1973), the publication of letters of Julius and Ethel Rosenberg was deemed justified by "the continuing interest in and importance of the celebrated Rosenberg case." It can scarcely be argued here that the enduring fame of Rudolph Valentino or the intrinsic literary and historical merit of "The Son of the Sheik" (whatever it may be) serves any public interest sufficient to endow these defendants with the privilege of fair use.[9]

## VII

 Defendants next argue that Dodd, Mead, & Co., which in 1952 filed the application for the renewal copyright in the name of Cecil Hull, had no authority to act as her agent.[10] In pressing this contention they have a heavy burden to bear. 17 U.S.C. § 209 [11] provides that a registration certif-

---

9. Another relevant consideration, as Judge Lasker noted, is whether the defendants' work tends to diminish the demand for the original. In this regard, an example cited by Nimmer at § 145 of his treatise closely parallels the instant action:
"Suppose A is the copyright owner of a published novel. B produces a motion picture copied from and substantially similar to A's novel. The motion picture may well not adversely affect the sale of A's novel. In fact it almost certainly will have the opposite effect. It is nevertheless clear that B may not invoke the defense of fair use. B's motion picture has not prejudiced the sale of A's work in the book medium, but it has certainly prejudiced the sale of A's work in the motion picture medium. If the defendant's work adversely affects the value of any of the rights in the copyrighted work (in this case the right to convert to motion picture form) the use is not fair even if the rights thus effected have not as yet been exercised by the plaintiff."

10. Dodd, Mead acquired Small, Maynard & Co., the original publisher of the novel, in 1929.

11. 17 U.S.C. § 209:
"§ 209. Certificate of registration; effect as evidence; receipt for copies deposited
In the case of each entry the person recorded as the claimant of the copyright shall be

icate issued by the Copyright Office is prima facie evidence of all of the facts stated therein. See Jerry Vogel Music Co. v. Forster Music Publisher, Inc., 147 F.2d 614 (2nd Cir. 1945); Wihtol v. Wells, 231 F.2d 550 (7th Cir. 1956); Rohauer v. Friedman, 306 F.2d 933 (9th Cir. 1962); Geisel v. Poynter Products, Inc., 295 F.Supp. 331 (S.D.N.Y.1968); Tennessee Fabricating Co. v. Moultrie Manufacturing Co., 421 F.2d 279 (5th Cir. 1970).

Defendants introduced no evidence tending to overcome the statutory presumption. They did call Jonathan Dodd, an employee of Dodd, Mead whose work involved the supervision of copyrights. He had been an employee of the firm since 1958, and thus had no first hand knowledge of the circumstances surrounding the renewal in 1952. Nor was he able to produce any documents that bore on the question of Dodd, Mead's authority to renew. He did, however, testify that the firm customarily handled all copyright matters for its authors, and it thus appears scarcely unusual that it processed the renewal of the Hull novel here. In sum, there is nothing in the record suggesting that Cecil Hull sought to deny Dodd, Mead the authority to act as her agent in procuring the renewal of the copyright. The statutory presumption has thus not been overcome, and this defense must also fail.

## VIII

 Finally, defendants argue that the 1965 agreement by which Cecil Hull assigned rights to Rohauer must be construed to exclude those rights that had previously been assigned by Edith Hull to Moskowitz. They point out that the agreement purported to convey "all the undersigned's right, title and interest (if any) in and to the motion picture and television rights." The agreement also contained the following parenthetical phrase: "the world motion picture rights in such literary property having been sold by Edith M. Hull in December 1925 to Joseph H. Moskowitz." Relying on these passages, defendants contend that the agreement cannot be deemed to convey the motion picture rights previously granted to Moskowitz.

This argument of course ignores the principle that assignments of rights made during the original term of the copyright do not bind those who succeed to the renewal rights. G. Ricordi & Co. v. Paramount Pictures, supra. Furthermore, plaintiffs have proffered a justification for the inclusion of the reference to the Hull-Moskowitz assignment which I find wholly convincing. They point out that the copyright law which ob-

entitled to a certificate of registration under seal of the copyright office, to contain the name and address of said claimant, the name of the country of which the author of the work is a citizen or subject, and when an alien author domiciled in the United States at the time of said registration, then a statement of that fact, including his place of domicile, the name of the author (when the records of the copyright office shall show the same), the title of the work which is registered for which copyright is claimed, the date of the deposit of the copies of such work, the date of publication if the work has been reproduced in copies for sale, or publicly distributed, and such marks as to class designation and entry number as shall fully identify the entry. In the case of a book, the certificate shall also state the receipt of the affidavit, as provided by section 17 of this title, and the date of the completion of the printing, or the date of the publication of the book, as stated in the said affidavit. The Register of Copyrights shall prepare a printed form for the said certificate, to be filled out in each case as above provided for in the case of all registrations made after July 1, 1909, and in the case of all previous registrations so far as the copyright office record books shall show such facts, which certificate, sealed with the seal of the copyright office, shall, upon payment of the prescribed fee, be given to any person making application for the same. Said certificate shall be admitted in any court as prima facie evidence of the facts stated therein. In addition to such certificate the register of copyrights shall furnish, upon request, without additional fee, a receipt for the copies of the work deposited to complete the registration."

tained in those countries adhering to the Berne Convention made no provision for copyright renewal. In most such countries, a copyright endured for the lifetime of the author plus fifty years.[12] A grant of rights under a copyright could continue as long as the copyright subsisted. but in certain countries, of which Great Britain was one, the rights revert to the author's heirs twenty five years after his death.[13] Plaintiffs thus point out that the 1965 assignment from Cecil Hull to Rohauer took place only twenty two years after Edith Hull's death. Hence Rohauer was at that moment vested only with rights to the work in the United States; in other countries, the motion picture rights would not have reverted to Cecil Hull for at least three more years. The reference to the Edith Hull-Moskowitz-assignment, then, was inserted simply to put Rohauer on notice of these limitations. I therefore decline to adopt defendants' proposed construction of the 1965 assignment.

## IX

Only one final point requires resolution. Subsequent to the trial of this action and the submission of post-trial memoranda, defendant Killiam Shows filed a motion to dismiss the action based on *res judicata*. The facts that underly the motion can be briefly stated. On April 26, 1972 an action was filed in the United States District Court for the Southern District of Iowa entitled Raymond Rohauer and Cecil W. Hull v. The Eastin Phelan Corporation, Civil Action No. 72–25–D. The complaint alleged that defendants Eastin-Phelan, Paul Killiam, and Killiam Shows, Inc. had infringed the plaintiffs' renewal copyright in "The Sons of the Sheik" by offering for sale and selling prints of the motion picture. At some point the action was dismissed as against Paul Killiam and Killiam Shows for want of personal jurisdiction. On February 7, 1974

Judge Stuart of the district court dismissed the action in its entirety pursuant to Rule 37(d) of the Federal Rules on account of Rohauer's failure to appear for a deposition in Iowa. The ruling was affirmed by the United States Court of Appeals for the Eighth Circuit on June 12, 1974, 499 F.2d 120 (8th Cir., 1974).

The defendant now argues that Rohauer is barred by the principle of *res judicata* from obtaining a favorable judgment on a cause of action which has previously been dismissed with prejudice in another forum. See generally, Lawlor v. National Screen Service Corp., 349 U.S. 322, 75 S.Ct. 865, 99 L.Ed. 1122 (1954). Defendant relies in particular on the decision of our Court of Appeals in Nasser v. Isthmian Lines, 331 F.2d 124 (2nd Cir. 1964), which holds that a dismissal pursuant to Rule 37(d) constitutes a dismissal on the merits and therefore bars a later identical cause of action. Hence even though none of Rohauer's claims were litigated in the Iowa action, defendant urges that the dismissal there must bar the instant proceeding.

Plaintiffs correctly note that this argument indicates a failure to perceive the distinction between *res judicata* and collateral estoppel. The distinction was succinctly stated in *Lawlor*, supra: "Thus, under the doctrine of *res judicata*, a judgment 'on the merits' in a prior suit involving the same parties or their privies bars a second suit based on the same cause of action. Under the doctrine of collateral estoppel, on the other hand, such a judgment precludes relitigation of issues actually litigated and determined in the prior suit, regardless of whether it was based on the same cause of action as the second suit." 349 U.S. at 326, 75 S.Ct. at 867. See also, Cromwell v. County of Sac, 94 U.S. 351, 24 L.Ed. 195 (1876); Commissioner v. Sunnen, 333

---

12. Berne Convention, Article 7, set out in Appendix O, Nimmer on Copyright, p. 1021.

13. See Copinger and Skone James, Copyright (10th ed., 1965) at ¶ 369. See also Copyright Act of 1956, Eighth Schedule, paragraph 6.

U.S. 591, 68 S.Ct. 715, 92 L.Ed. 898 (1948).

I find the doctrine of *res judicata* plainly inapplicable because the situation before me fails to meet one critical element of the *Lawlor* test: the Iowa and New York suits are not based on the "same cause of action". It is of course true, as defendant points out, that in both cases the same renewal copyright is alleged to be infringed. But the *acts of infringement* complained of are different. *Lawlor* itself stands for the proposition that separate wrongs, although similar in nature, give rise to separate causes of action. The Court held that a prior consent judgment of dismissal in a private antitrust action did not bar a similar action based on subsequent acts of the defendant, although such acts were of the same nature as those challenged in the first suit. The Court rejected the theory embraced by the lower court that the suits were based on the same cause of action because they involved "essentially the same course of wrongful conduct". Nickerson v. Kutschera, 295 F.Supp. 1 (D.Del.1969), comes even closer to the instant case. There the court held that successive actions alleging infringement of the same patent could not be based on the same cause of action because "[p]laintiff's right in each case is claimed to have been invaded by different acts of wrongdoing . . ." See also, 1B Moore's Federal Practice, ¶ 0.410[1].

 Because the causes of action are different, defendant cannot invoke the principle of *res judicata* or avail himself of the *Nasser* holding, which applies only to an identical cause of action asserted in a later suit.[14] Nor can it be sensibly argued that the instant action is barred by collateral estoppel. As was pointed out in *Lawlor*, that doctrine precludes relitigation of issues actually *litigated and determined* in a previous action. In the Iowa action, however, noth-

ing was litigated and hence nothing determined; the action was dismissed because of plaintiff's failure to comply with the court's discovery rulings. Such a dismissal can have no collateral estoppel effect. See Canaan Products, Inc. v. Edward Don & Company, 388 F.2d 540 (7th Cir. 1968); 1B Moore's Federal Practice ¶ 0.444. Accordingly, the motion of defendant Killiam Shows to dismiss is denied.

### Conclusion

For all of the reasons herein stated, I hold that plaintiffs' renewal copyright in the novel "The Sons of the Sheik" was infringed by the performances of the motion picture "The Son of the Sheik" on July 13, October 11, and October 16, 1971. I further hold that defendants Killiam Shows, Inc. and Educational Broadcasting Corporation are jointly and severally liable for such acts of infringement. Finally, I hold that defendants Paul Killiam and Bowery Savings Bank are not liable, and the action is accordingly dismissed as against them.

It is so ordered.

---

14. The *Nasser* doctrine would obviously be fully applicable if Rohauer now sought to prosecute an action in this court based on the acts of infringement alleged in the Iowa action.